MAINE SUPREME JUDICIAL COURT                    Reporter of Decisions
Decision:     2026 ME 74
Docket:       Kno-25-10
Argued:       November 14, 2025
Decided:      July 30, 2026

Panel:        STANFILL, C.J., and MEAD, CONNORS, LAWRENCE, DOUGLAS, and LIPEZ, JJ.

PAT DOE

v.

JEFFREY J. WEYMOUTH

LAWRENCE, J.

[¶1]  Jeffrey J. Weymouth appeals from a final order of protection from abuse entered by the District Court (Rockland, *Mattson, J.*) in favor of Pat Doe.[1] Following the parties' divorce in September 2024, Weymouth engaged in a course of conduct that involved making a crude, sexually suggestive, and violent Facebook post directed at Doe; slamming the metal mailbox on the side of Doe's home as he delivered a child support payment to Doe despite her prior requests that the child support be directly deposited in her bank account; and disseminating a "warning poster" around Doe's neighborhood that intimated that Doe was a "black widow."  Based on the escalating nature of these

---

[1] In accordance with the Violence Against Women Act, 18 U.S.C.A. § 2265(d)(3) (Westlaw through Pub. L. No. 119-100), we employ the pseudonym "Pat Doe" for the plaintiff in this matter.

2

incidents, as well as Weymouth's history of anger issues, alcohol abuse, and suicidal statements, the trial court found that Weymouth had abused Doe as defined by 19-A M.R.S. § 4102(1)(B) (2026). Weymouth argues that his First Amendment rights were violated because the Facebook post and warning poster were not true threats but rather were protected speech, and he cites to the United States Supreme Court's decision in *Counterman v. Colorado* in support of this contention. 600 U.S. 66 (2023); *see* U.S. Const. amend. I. We are not persuaded by this argument because, as Weymouth conceded at oral argument, the post-*Counterman* amendments to section 4102(1)(B) render the issues in this case purely factual in nature. And because we hold that the evidence is sufficient to support the court's finding of abuse, we affirm.

## I. BACKGROUND

[¶2] On November 12, 2024, Pat Doe filed a complaint for protection from abuse against Jeffrey Weymouth. The court (*Gilbert, J.*) issued a temporary protection order on the same day. The court held a final hearing on December 3, 2024. The following facts are drawn from the District Court's (*Mattson, J.*) findings and the procedural record. *See Doe v. Costin*, 2025 ME 23, ¶ 2, 331 A.3d 456.

[¶3]  The parties were divorced in September 2024.  During the marriage, Weymouth struggled with alcohol misuse and anger issues and once told Doe that he was suicidal and would kill himself using a gun.  Weymouth owns multiple firearms.  Because the divorce judgment required Weymouth to submit to daily breath testing for alcohol to have contact with the parties' child and Weymouth had many missed tests and had many positive tests since the divorce, Doe had reason to believe that Weymouth was misusing alcohol throughout the fall of 2024, when the events leading to this action for protection from abuse occurred.

[¶4]  In late September 2024, Weymouth posted on his Facebook page a staged photo that was designed to convey frustration with the parties' marriage.  In the photo, Weymouth poses next to a fake severed finger with a wedding band on it and flashes a hand gesture known as the "shocker," which refers to an offensive sex act involving digital penetration of the anus.  The court found that Weymouth intended the Facebook post to be a message directed at Doe.

[¶5]  In early October, Weymouth went to Doe's home to deliver his child-support check, even though Doe had asked him to make his support payments to her via direct deposit.  Doe was at home, and Weymouth knew she

was there because her car was in the driveway. Weymouth placed the check into her metal mailbox attached to the side of her house. He closed the mailbox and slammed it loudly against the side of the house, which Doe testified caused her to be too scared to go outside to check the mailbox right away. Weymouth later messaged her referring to the child support payment as a "subsidy check."

[¶6] Finally, a "warning poster" appeared in Doe's neighborhood. At trial, Weymouth's mother testified that she created the poster and threw it out of her car window while driving through Doe's neighborhood. The court did not find this testimony credible and instead found that Weymouth either created the warning poster or was involved in its creation and that Weymouth hung it in Doe's neighborhood. The poster includes a collage of photos of Doe with former partners, the word "WARNING," and images including a picture of a black widow spider. The court found that the black widow spider symbolizes domestic violence homicide.

[¶7] Based on those three incidents, together with Weymouth's history of alcohol misuse, suicidal statements, possession of firearms, and anger issues, the court found by a preponderance of the evidence that Weymouth had abused Doe by placing her in fear of bodily injury through a course of conduct that included threatening, harassing, or tormenting behavior and that Weymouth

had consciously disregarded a substantial risk that his speech would place Doe or a reasonable person in her position in fear of bodily injury. *See* 19-A M.R.S. § 4102(1)(B). The court issued a final order of protection from abuse prohibiting Weymouth from contacting Doe. Weymouth timely appealed. *See* M.R. App. P. 2B(c)(1).

## II. DISCUSSION

[¶8] Although we review a First Amendment challenge de novo, *State v. Heffron*, 2018 ME 102, ¶ 11, 190 A.3d 232, "[i]t is the fact-finder who properly determines whether a true threat or harassment has occurred," and we review factual findings for clear error, *Childs v. Ballou*, 2016 ME 142, ¶ 17, 148 A.3d 291; *Doe v. Batie*, 2020 ME 124, ¶ 5, 240 A.3d 62.

### A. True Threats and the First Amendment

[¶9] "[I]t is well understood that the right of free speech is not absolute at all times and under all circumstances." *Chaplinsky v. New Hampshire*, 315 U.S. 568, 571 (1942). One unprotected category of speech is true threats, which are "serious expressions conveying that a speaker means to commit an act of unlawful violence." *Counterman*, 600 U.S. at 74 (alteration and quotation marks omitted). However, whether a communication is a true threat "depends not on the 'mental state of the author,' but on 'what the statement conveys' to the

6

person on the other end." *Id.* (quoting *Elonis v. United States*, 575 U.S. 723, 733 (2015)). Weymouth centers his argument on the Supreme Court's decision in *Counterman*, which held that in criminal prosecutions based only on a defendant's threatening speech, the State must, to avoid running afoul of the First Amendment, prove that the defendant acted recklessly—that is, with "conscious[] disregard[]" of a "substantial and unjustifiable risk that the conduct w[ould] cause harm to another." *Id.* at 73, 78-80 (alterations and quotation marks omitted). Weymouth argues that the protection order against him is a violation of his First Amendment rights because his conduct did not amount to a true threat and he did not act recklessly.

[¶10] In response to *Counterman*, the Maine Legislature amended several criminal statutes and the protection-from-abuse statutes to "align[] the laws of this State with the new federal standard set by *Counterman v. Colorado*." L.D. 2085, Summary (131st Legis. 2024). Title 19-A M.R.S. § 4102(1)(B) was amended and now defines abuse as

> [a]ttempting to place or placing another in fear of bodily injury through any course of conduct, including, but not limited to threatening, harassing or tormenting behavior. *When the course of conduct violates this paragraph based on the content of the actor's speech, the actor must have consciously disregarded a substantial risk that the speech would place a reasonable person in fear of bodily injury*.

(New language italicized); *see* P.L. 2023, ch. 519, § 4 (emergency, effective Mar. 6, 2024).  This is the version of the statute that the trial court applied in this case, and it specifically found that

> [Weymouth] consciously disregarded a substantial risk that his speech would put [Doe] or a reasonable person in her position in fear of bodily injury, again because of the violent references in both the warning poster and the Facebook selfie, and in light of the history between the parties, that includes statements regarding suicide and possession of firearms and what appear[s] to be [an] escalating pattern of drinking alcohol.

[¶11]   Weymouth does not argue that section 4102(1)(B) is unconstitutional but rather that its application to the facts of this case is problematic because the evidence does not support a finding that he acted recklessly or that his communications were "serious expressions conveying that [he] mean[t] to commit an act of unlawful violence." *Counterman*, 600 U.S. at 74 (alteration and quotation marks omitted).  Although Weymouth attempts to frame this issue as one that should be reviewed de novo, the court's application of the amended protection-from-abuse statute transforms this case into a straightforward question of the sufficiency of the evidence.

## B.     Trial Court's Evaluation of Weymouth's Speech

[¶12]  Before we address the sufficiency of the evidence, we first address Weymouth's argument that each of his communications must independently be

a true threat for the trial court to have properly considered them as part of a course of conduct under 19-A M.R.S. § 4102(1)(B).

[¶13]  Here, the trial court first considered the Facebook post with the severed ring finger and the distinctive hand gesture and concluded that it was a message intended for Doe with at least two meanings.  It found that the former meant that Weymouth was done with marriage, expressed in an inherently violent way, and the latter referred to what Doe described in her testimony as a "vile," "disgusting and grotesque" sexual act.

[¶14]  The trial court also addressed the warning poster.  Based on Weymouth's testimony, the trial court first found that the warning poster and the Facebook post contained similar symbolism.  The trial court then found that the warning poster also contained a double meaning—warning others that Doe was a black widow spider but also warning Doe of the domestic violence homicide associated with black widows.  Based on the three events at issue in this case,[2] we perceive no error in the trial court's determination that Weymouth's speech in the context of his Facebook post and the warning poster was suggestive of violence such that it was potentially threatening, harassing,

---

[2] The trial court also made findings in regard to what it called "the mailbox incident."  The trial court found that although Weymouth knew that Doe preferred that he not hand deliver his child-support payments, he went to her home, knowing that she was there, slammed the metal mailbox to create a lot of noise, and later emailed her about his delivery of her "subsidy."

or tormenting behavior and thus part of Weymouth's course of conduct to place Doe in fear of bodily injury. 19-A M.R.S. § 4102(1)(B).

[¶15] We further note that in *Counterman*, the Supreme Court considered a criminal defendant's course of conduct that involved communications that sometimes were prosaic, sometimes suggested stalking behavior, and sometimes portended violence. *Counterman*, 600 U.S. at 70. There, the Supreme Court held that the State was required to prove that Counterman acted recklessly in making those statements to the victim but did not hold that each individual message sent to the victim was required to be a true threat made with conscious disregard for a substantial risk that someone would be harmed by the messages. *Id.* at 70, 72-82.

[¶16] Indeed, our true-threat cases stress the importance of considering the circumstances and context of the threatening communications. *See State v. Hotham*, 307 A.2d 185, 187 (Me. 1973) (holding that the jury could properly conclude that the defendant's statements were true threats based on the circumstances in which they were made). In *Hotham* we held that "in determining whether the words used constitute a true 'threat,' the circumstances under which the threat is uttered and the relations between the parties may be taken into consideration." *Id.* at 185-6 (citing *State v. Cashman*,

217 A.2d 28, 29 (Me. 1966) ("Words which in one context might be harmless and innocuous become menacing under other circumstances.")). Accordingly, we review the court's findings regarding Weymouth's course of conduct in light of the circumstances the communications were made in and the relationship between the parties, rather than considering each communication in a vacuum.

## C.     Sufficiency of the Evidence

[¶17]   When we review a trial court's findings for clear error, we are "limited to an investigation of the record to determine whether competent evidence exists to support the trial court's factual conclusions." *Smith v. Hawthorne*, 2002 ME 149, ¶ 15, 804 A.2d 1133. "The deferential standard of 'clear error' is particularly appropriate in actions for protection from abuse where the trial court's ability to observe the witnesses invariably plays a part in its assessment of the impact a particular person's words and actions had upon another person." *Id.* ¶ 16. The fact finder may draw "reasonable inferences from circumstantial evidence presented at trial, such as whether the accused intended to harass, intimidate, or cause fear." *Allen v. Rae*, 2019 ME 53, ¶ 7, 206 A.3d 902. When no motion for further findings is filed, we assume that the trial court made "all findings necessary to support its judgment" if those

findings are supported by competent evidence in the record. *Finucan v. Williams*, 2013 ME 75, ¶ 16, 73 A.3d 1056; M.R. Civ. P. 52(b).

[¶18]  Here, we cannot say that the trial court clearly erred when it found that Weymouth abused Doe.  Additionally, to the extent that the court did not make an explicit finding that Weymouth's communications were "serious expressions conveying that [he] mean[t] to commit an act of unlawful violence," we will assume that the court made that finding because it is supported by competent evidence.  *Counterman*, 600 U.S. at 74 (alteration and quotation marks omitted); *Finucan*, 2013 ME 75, ¶ 16, 73 A.3d 1056.

[¶19]  The evidence supports a finding that the Facebook post and the warning poster were objectively threatening, regardless of the fact that they did not contain explicit threats of violence.  *See Smith*, 2002 ME 149, ¶ 20, 804 A.2d 1133 ("[I]f a defendant engages in a course of conduct that is threatening, harassing or tormenting, the conduct can cause the victim to be placed in fear of bodily injury even if the defendant has not verbally threatened violence or committed actual acts of violence against the victim." (quotation marks omitted)).  The Facebook post and the warning poster contained violent and vitriolic imagery.  Doe testified that Weymouth had anger and addiction issues, that he had threatened to kill himself with a gun in the past, that he owned

multiple guns, and that she feared "he could hurt [her] and then take care of himself." The warning poster in particular involved planning and consideration—its creator had to find the photos, print them out and organize them with the text, photocopy the resulting collage, and take it to Doe's neighborhood. Weymouth himself asserts in his brief that the Facebook post was "staged," with a hat referencing marriage, a self-help book about life transitions, and a fake plastic finger wearing a wedding band. Both of these communications show deliberation, coupled with a vindictiveness that, based on the record evidence, actually did place Doe in reasonable fear of bodily injury.

[¶20] Although Weymouth argues that the evidence does not support the court's finding that that he acted recklessly, his involvement in the creation and placement of the warning poster, his intemperate misuse of Doe's mailbox as he hand delivered her "subsidy check" despite her requests that he not do so, and his own admission that he created the Facebook post all support the finding that he consciously disregarded a substantial risk that Doe would view his messages as threatening violence. The creation of the warning poster and the Facebook post each required forethought and understanding of their meaning and effect. Similarly, Weymouth was aware of Doe's desire to avoid uninvited

contact with him regarding child support, he knew that slamming Doe's mailbox would produce a lot of noise, and he also knew that she was at home when he did it. He testified that he had installed the mailbox, and Doe testified that Weymouth would have seen her car in the driveway and that the noise from the mailbox was not normal and "very aggressive."[3] The evidence supports the court's finding that Weymouth's course of conduct, when viewed in the context of the parties' relationship, conveyed serious threats of violence and actually placed Doe in fear of bodily injury, and that Weymouth acted recklessly when engaging in that conduct.

The entry is:

Judgment affirmed.

---

Michael Whipple, Esq., and Jeffrey P. Sherman, Esq. (orally), Hallett Whipple Weyrens, Portland, for appellant Jeffrey J. Weymouth

Eric B. Morse, Esq. (orally), Strout & Payson, P.A., Rockland, for appellee Pat Doe

Rockland District Court docket number PA-2024-244
For Clerk Reference Only

---

[3] That Weymouth's actions on this occasion apparently were meant to be a further expression of his anger towards Doe and dissatisfaction with the terms of their divorce is borne out by his subsequent email to Doe in which he referred to his delivery of the child support payment as "[having] just dropped off [Doe's] weekly subsidy check." Based on his actions, Doe understood that Weymouth was angry and spiteful about having to pay her child support or any other money pursuant to the terms of their divorce.